SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

|  |  |  |
|---|---|---|
| CS ALBANY REALTY, LLC, | : | Index no. _____/2023 |
|  | : |  |
| Plaintiff, | : | **COMPLAINT FOR** |
|  | : | **DECLARATORY JUDGMENT** |
| v. | : |  |
|  | : |  |
| PARAGON WIRELESS GROUP, LLC, | : |  |
|  | : |  |
|  | : |  |
| Defendant. | : |  |

Plaintiff, CS Albany Realty, LLC ("CS Albany"), by and through its undersigned

counsel, files this Declaratory Judgment Complaint against Defendant, Paragon Wireless Group,

LLC ("Paragon").

### The Parties

1.      CS Albany is a Delaware limited liability company with its principal place of

business at 740 Centre View Blvd Crestview Hills, Kentucky 41017. CS Albany owns and

operates the Albany Marriott Hotel located at 189 Wolf Road, Albany, NY 12205.

2.      Paragon is, on information and belief, a Florida limited liability company with its

principal place of business at 336 N.E. 28th Terrace, Boca Raton, Florida, 33431, and an agent /

address for service of process c/o Christy Rivers, 350 Club Circle, Suite 208, Boca Raton,

Florida 33487.

### Jurisdiction and Venue

3.      This Court has personal jurisdiction over Defendant pursuant to CPLR

§302(a)(1), because this action arises out of an alleged transaction of business in this state and/or

an alleged contract for Paragon to provide goods and/or services within this state.

3821769_1

4.    Jurisdiction for declaratory relief is pursuant CPLR §3001.

5.    Venue is proper in this Court pursuant to CPLR §§ 503(a) and (d), and 507, as this county is where Plaintiff's Hotel is located, where Plaintiff's claims arose and/or where a transaction or occurrence took place out of which Plaintiff's claims arose, and this action seeks a judgment that would affect the possession, use or enjoyment of real property located in this county.

## Factual Allegations

6.    Communications companies (such as wireless service providers) place their antennas and other equipment high off the ground to achieve maximum range.  This has created an industry in which building owners lease space on their rooftops (and other parts of their buildings) to such communications companies.  This case concerns this rooftop lease industry.

7.    Paragon claims that it is a rooftop lease broker, finding companies that need rooftop space and connecting them with building owners who wish to lease such space.

8.    Plaintiff is a building owner.  CS Albany  owns the building containing the Albany Marriott Hotel, at 189 Wolf Road, Albany, New York 12205.

9.    Paragon claims that it entered into a Rooftop Lease agreement with CS Albany , on January 31, 2023 (the "Rooftop Lease"), under which Paragon was to find companies to lease rooftop space on Plaintiff's buildings, in return for which Paragon would earn an on-going commission consisting of 25% of the communications companies' lease payments for the leased space. A copy of this Rooftop Lease is attached hereto as Exhibit 1.

10.    The Rooftop Lease states that it is for an initial term of 25 years, with automatic 5-year renewals thereafter, which Plaintiff cannot avoid unless Paragon is in breach. The Rooftop Lease further provides that Paragon would also be entitled to 25% of the lease payments

2

on pre-existing leases—that is, on leases that Paragon did not obtain for Plaintiff. Paragon has also claimed to be entitled to a $5,000 per month "retainer," although no such right or obligation is set forth in the Rooftop Lease.

11.     It is clear that Paragon believes it entered into this Rooftop Lease with Plaintiff, and that this Rooftop Lease is binding and enforceable, because, among other things, Paragon has brought suit against CS Albany in Florida state court, claiming breach of this contract.  CS Albany has filed a motion to dismiss this suit for lack of personal jurisdiction, because it has no connection to and no contacts with the forum state of Florida.

12.     Plaintiff CS Albany brings this action seeking a declaration from the Court that the Rooftop Lease is not enforceable.

13.     The Rooftop Lease is not enforceable for at least <u>three reasons</u>.

14.     <u>First</u>, the Rooftop Lease is unenforceable because, under the terms of the Rooftop Lease, Paragon is not actually obligated to do anything.  Rather, Paragon only retains the "right" to do things, if (and only if) it chooses to.  Paragon could make no effort to find rooftop lessees under this contract and not be in breach.

15.     It is fundamental principle of contract law that contractual promises must be supported by consideration to be enforceable.  Where consideration is lacking, there is no contract.  And where, as here, a promise is illusory and imposes no obligation on the promisor, there is no enforceable agreement.  Put differently, a contractual promise that is optional does not constitute a promise.

16.     The Rooftop Lease violates this basic rule of contracts.  Paragon could do nothing under the Rooftop Lease, make no effort to find lessees, collect no payments, and remit nothing to Plaintiff, and Paragon would never violate any term of the Rooftop Lease.  As a result, the

Rooftop Lease is unenforceable for lack of consideration.

17.     Even worse, the Rooftop Lease appears to entitle Paragon to collect payments from pre-existing leases that Paragon did not obtain for Plaintiff and thus without having provided any consideration for collecting those monies.

18.     Second, the Rooftop Lease is unenforceable because it allows Plaintiff to terminate only if Paragon breaches, but Paragon can terminate the agreement for any reason or for no reason on 180 days' notice.

19.     This lack of mutuality also makes these agreements unenforceable; where, as here, one party has an unrestricted right to terminate the contract for no reason, such a contract is illusory and unenforceable.

20.     Further, Plaintiff's inability to terminate the contract unless Paragon is in breach compounds the unconscionable provision for a 25 year initial lease term, with subsequent automatic five-year renewals that Plaintiff cannot avoid, thus rendering Plaintiff beholden to Paragon (and at its mercy) practically in perpetuity.

21.     Third, the Rooftop Lease is unenforceable because it was not executed by the correct party, CS Albany.

22.     The first page of the Rooftop Lease provides that the agreement is between "Landlord and Tenant," which are defined as CS Albany, on the one hand (as Landlord), and Paragon, on the other (as Tenant).

23.     However, CS Albany did not sign this agreement.  On the contrary, it was signed by Paragon and Columbia Sussex Corporation.  However, while Columbia Sussex Corporation's address is listed in the Rooftop Leases as a "notice address" for Plaintiff, there is no indication in the Rooftop Lease that Columbia Sussex Corporation was authorized to execute this agreement

or otherwise act on behalf of CS Albany.

24.     In fact, Columbia Sussex Corporation did not authorize Plaintiff to enter into the Agreement.  Nor did Scott Yung, whose e-signature appears on the Rooftop Lease, have authority on behalf of CS Albany or Columbia Sussex to enter into this agreement.

25.     As a result, the Rooftop Lease agreement is unenforceable.  Because Paragon continues to try to enforce this unenforceable agreement, Plaintiff seeks declaratory relief herein that the Rooftop Lease is unenforceable.

## Count I – Declaratory Judgment

26.     Plaintiff repeats and re-alleges paragraphs 1 – 25 above as if fully set forth.

27.     Based on the foregoing, an actual controversy has arisen and now exists between the parties concerning the validity and enforceability of the Rooftop Lease, for which Plaintiff seeks a declaration of rights.

28.     A judgment is necessary declaring that the Rooftop Lease is invalid and unenforceable, and that Plaintiff owes no contractual or other obligations to Paragon.

29.     An adversarial conflict exists between Plaintiff, on one hand, and Defendant, on the other, arising with respect to the meaning of the terms of the Rooftop Lease.

30.     There is a substantial controversy between the parties, who have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The controversy between the parties is immediate and real, and the dispute is concrete, tangible, and bounded.

31.     As set forth herein, Paragon takes the position that it can enforce the Rooftop Lease against CS Albany, and it has brought (and is expected to continue to bring) lawsuits based on the premise that the Rooftop Lease is enforceable.

5

32.     Unless this Court issues the requested relief, CS Albany will continue to suffer real and reasonable apprehension as to whether it is bound to the Rooftop Lease, and it will continue to face difficulty finding rooftop lessees to lease rooftop space while this dispute continues to percolate.

33.     Plaintiff therefore seeks entry of a declaratory judgment that the Rooftop Lease is invalid and unenforceable.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter a declaratory judgment providing that the Rooftop Lease is invalid and unenforceable; that CS Albany has and owes no obligations, contractual or otherwise, to Defendant Paragon Wireless Group; and granting such additional relief as this Honorable Court deems just and proper under the circumstances.

Respectfully submitted,

/s/ David Picker

David B. Picker, Esquire
SPECTOR GADON ROSEN VINCI P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888 / (215) 241-8844 fax
dpicker@sgrvlaw.com

Dated: November 29, 2023

305 Broadway, 7th Floor
New York, NY 10007
*Attorneys for Plaintiff*

6

## VERIFICATION

I, JOSEPH YUNG, state that I am the Vice President of Plaintiff CS Albany Realty, LLC, and am authorized to make this Verification on its behalf.  I have read the foregoing Complaint and hereby verify that the statements contained therein are true to the best of my knowledge, information and belief.

_____
JOSEPH YUNG

Sworn to before me this

29ᵗʰ day of November, 2023

_____
Notary Public

MARY SHEANSHANG
Notary Public, Kentucky State at Large
My Commission Expires March 23, 2024
Notary I.D. KYNP4797

# EXHIBIT 1

Case 1:24-cv-00340-AMN-DJS Document 2 Filed 03/08/24 Page 9 of 27

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

# ROOFTOP LEASE

THIS ROOFTOP LEASE ("*Lease*") is made as of the date of last signature of the parties below ("*Commencement Date*") by and between Landlord and Tenant.

## 1. PARTIES AND BUSINESS TERMS.

"*Landlord*": CS Albany Realty, LLC, successor to CCMH IHP LLC, a Corporation

"*Landlord Notice Address*":

Columbia Sussex Corp
Attn: Scott Yung
740 Centre View Boulevard
Crestview Hills, KY 41017

with a copy to:

scott@columbiasussex.com

"*Landlord Payment Address*":

"*Tenant*": Paragon Wireless Group, LLC a Limited Liability Company

"*Tenant Notice Address*":

Paragon Wireless Group, LLC
336 NE 28th Terrace
Boca Raton, FL 33431
Attn: Legal

with a copy to:

jmelton@paragonwirelessgroup.com

"*Building*": That building or complex of buildings and other real property improvements including Albany Marriott Hotel having an address of 189 Wolf Rd, Albany, NY 12205 in Albany County, New York.

"*Property*": Each parcel of land described on Exhibit A including any Building. Landlord agrees to conduct best efforts to provide general building information, legal description and to provide rooftop photos and plans (if available).

"*Initial Term*": Twenty-five (25) years.

"*Renewal Terms*": Each of the twelve (12) successive periods of five (5) years.

"*Percentage Rent*": Seventy-five percent (75%) of the License Fees, as defined in Section 6(a), collected on Licenses plus Seventy-five percent (75%) of any increases in the License Fees attributable to any amendment, renewal, or extension of Licenses and as further defined in Section 6.

"*Pre-Existing License*": Any agreement with a Wireless Provider for the utilization of the rooftop of the Building or any other exterior surfaces of the Building including without limitation parapet walls, exterior walls, elevator rooms, and rooftop towers, and masts for the provision of Wireless Services to areas

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

surrounding the Property. Listed here in <u>Exhibit B</u>. Except as specifically distinguished in this Lease, a Pre-Existing License will have the same meaning as a "License."

"**Management Fee**": With respect to Pre-Existing Licenses, Tenant shall receive a fee equal to Twenty-five percent (25%) of the License Fees collected on Pre-Existing Licenses, specifically described in Exhibit B, plus Twenty-five percent (25%) of any increase in the License Fees attributable to any amendment, renewal, or extension of Pre-Existing Licenses and as further defined in Section 6.

**2. LEASE OF DEMISED PREMISES.** Landlord leases to Tenant (a) any surface of the rooftop of the Building or any other exterior surfaces of the Building including without limitation parapet walls, exterior walls, elevator rooms, and rooftop towers and masts approved by Landlord as a Wireless Site as defined in and pursuant to Section 6(a) and (b) any interior rooms or areas within the Building approved by Landlord pursuant to Section 6(a). In addition, Landlord grants an easement appurtenant to said rooftop and interior areas, the non-exclusive right to: (i) utilize any existing access easements from a public way to the Demised Premises, or if sufficient access easements do not exist, to request Landlord to grant or secure said access easements at no additional cost to Tenant; (ii) utilize any existing utility easements from a public way to the Demised Premises, or if sufficient utility easements do not exist, to request Landlord to grant or secure said utility easements at no additional cost to Tenant or to any party providing said utilities other than the reasonable cost of installing said utilities, and at no cost markup or profit by Landlord; and (iii) utilize any existing utility connections and entries into and through the Building and any existing vertical and horizontal risers, raceways, conduits, and telecommunications pathways in the Building. The leased areas and easement are the "**Demised Premises**."

**3. PERMITTED USE.** Tenant has the exclusive right to utilize the Property for the following uses ("**Permitted Use**"):

    **(a)** to market the Property to any party that provides Wireless Services (as defined below) ("**Wireless Provider**");

    **(b)** to enter into, modify, and maintain agreements between Tenant and Wireless Providers for the use of the Demised Premises for the provision of Wireless Services (each agreement is a "**License**" and each Wireless Provider that is a party to a License is a "**Licensee**"); and

    **(c)** to install subject to Landlord's approval pursuant to Section 6(b), any equipment directly or indirectly utilized for the provision of Wireless Services ("**Wireless Equipment**").

**4.** Landlord will not use or occupy the Property for the Permitted Use nor will it permit other parties to use or occupy the Property for the Permitted Use. Landlord will refer to Tenant all inquiries from third parties for the use of the Property for the Permitted Use. Landlord reserves the right to allow other occupants of the Building to install and maintain equipment on the rooftop of the Building for the transmission or reception of Wireless Services that are ancillary to the Landlord's or its occupants' primary use of the Building, such as satellite dishes for television reception or antennas for private two-way radio service. Tenant is not responsible for any equipment installed or operated by Landlord or any other occupant of the Building. "**Wireless Services**" are any services for the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services, among other things, the receipt, forwarding, and delivery of communications, incidental to such transmission (defined as "Radio Communication" services in 47 U.S.C. §153(40) as may be amended or superseded).

**5. TERM.** The "**Term**" is the Initial Term and any Renewal Term in effect as provided below:

Rooftop Lease
Site _____

2

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

(a)    **Initial Term.**  The Initial Term will commence on the Commencement Date and will expire at 11:59 p.m. on the last day of the calendar month of the Commencement Date in the final year of the Initial Term, provided however that if the Commencement Date occurs on the first day of a calendar month, then the Initial Term will expire at 11:59 p.m. on the last day of the prior month in the final year of the Initial Term.

(b)    **Renewal Terms.**  This Lease will be automatically extended for each Renewal Term unless a Default exists (as defined in Section 13(a)).

(c)    **Holdover.**  In the event that Tenant (but not any Licensee that has attorned to Landlord) remains in possession of the Demised Premises beyond the termination or expiration of this Lease, its occupancy will be deemed a month-to-month tenancy under the same terms of this Lease that may be terminated by either party after thirty (30) days' written notice.

## 6.  RENT.

(a) **Payment of Rent.**  Tenant will pay Percentage Rent to Landlord on the fifteenth (15th) day of each month for any License Fees (as defined below) collected in the prior month.  Percentage Rent is payable without demand to Landlord at Landlord's Payment Address. Tenant may not abate or offset Percentage Rent except in the event of casualty pursuant to Section 16(a), overpayment, or upon Landlord's prior written consent.  Notwithstanding the expiration or termination of the Agreement, Tenant will continue to receive License Fees directly from any Licensees and will remit Percentage Rent to Landlord in accordance with this Section 6(a) for the term of each License, including any amendments and renewals thereof ("*Residual Payments*"). "*License Fees*" are all rent actually collected from any Licensee (including the Pre-Existing Licensees as described in section 29) under a License including amendments and renewals thereof but excluding: (i) any reimbursements or pass-throughs from Licensees to Tenant for charges including but not limited to utility charges, taxes, or other pass-through expenses or (ii) any fees from Licensees to Tenant for services performed on behalf of Licensees including but not limited to site acquisition, due diligence, design and engineering work, construction, site inspections, radiofrequency monitoring and testing, repairs, and zoning and permitting.

(b)    **Rent Statements and Audit.**  Tenant will provide Landlord a statement detailing the amount of License Fees and other sums collected by Tenant for the immediately preceding calendar month ("*Rent Statement*") with each payment of Percentage Rent upon Landlord's written request. Landlord at its own cost may audit Tenant's records pertaining to License Fees and other sums payable or collected by Tenant from Licensees for the immediately prior Lease Year.  The audit will be performed during normal business hours at the principal office of Tenant by a certified public accountant who is not compensated on a contingent fee basis.  If the audit reveals any underpayment to Landlord, then Landlord must give notice to Tenant accompanied by supporting data within thirty (30) days from the audit completion date.  Tenant will pay any undisputed amount of underpayment within sixty (60) days of notice.  The failure of Landlord to timely request an audit or to provide notice of an underpayment is conclusive acceptance by Landlord of the contents of the Rent Statements for the immediately prior Lease Year.  Landlord and its auditor will keep all Tenant records as confidential and will not disclose them to any party except on a need-to-know basis in connection with the administration of or a dispute involving this Lease, any existing financing or any prospective sale, lease or leaseback of all or any part of the Building, or any registration or filing with any governmental authority or pursuant to a subpoena or other judicial process.  A "*Lease Year*" is each twelve (12) consecutive calendar month period, provided that the first Lease Year will commence on the Commencement Date and expire on the last day of the calendar month in which the first anniversary of the Commencement Date occurs, unless the Commencement Date occurs on the first day of a calendar month, in which case, the first Lease Year will expire on the day immediately preceding the first anniversary of the Commencement Date.

Rooftop Lease
Site _____

3

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

## 7. INSTALLATION, MAINTENANCE, AND RELOCATION.

**(a)    Landlord Approval of Wireless Sites.**  Upon receipt of any request by a Wireless Provider to collocate at the Demised Premises, Tenant will request a meeting with Landlord to identify a location at the Property that is suitable for the location of Wireless Equipment.  Landlord will arrange a meeting at the Property within five (5) business days of a request and will approve the proposed location or suggest an alternative location at the time of the meeting or within three (3) business days thereafter.  Upon Landlord's sole but reasonable approval of the location and the execution of a License, the location and any Wireless Equipment that is installed will be a **"*Wireless Site.*"**

**(b)    Landlord Approval of Plans.**  Prior to the installation of any Wireless Equipment, Tenant will submit plans of the proposed installation to Landlord (**"*Plans*"**).  Landlord will reasonably approve or reject the Plans with specific reasons within ten (10) business days of receipt of any initial Plans and within five (5) business days of receipt for revisions to rejected Plans.  It will be reasonable for Landlord to reject the Plans if the installation would (i) adversely affect the aesthetics of the Property; (ii) adversely affect the structural integrity of the Building or the proper functioning of any existing mechanical, electrical, sanitary or other systems of the Property; or (iii) adversely affect Landlord's ability to lease or operate the Property.  Landlord will also provide in writing any special conditions or requirements related to the proposed installation.  References in this Lease to "Plans" will include all subsequent modifications approved by Landlord.

**(c)    Required Approvals.**  Prior to installing any Wireless Equipment, Tenant will obtain any applicable licenses, permits, authorizations, consents, and approvals required by any government agency (**"*Required Approvals*"**).  Landlord will execute any applications or letters of authorization within five (5) business days of a request and will cooperate with Tenant and Licensees to obtain any Required Approvals.

**(d)    Installation of Equipment.**  Wireless Equipment will be installed in a good and workmanlike manner in accordance with the Plans; any Required Approvals; any laws, regulations, and directives of any government agency having jurisdiction over the Property (**"*Applicable Law*"**); and current industry practices.  Work will not materially interfere with Landlord's use of the Property.

**(e)    Tenant Maintenance.**  Tenant will at its own expense maintain (or cause Licensees to maintain) in reasonable condition: (i) the non-structural portions of any space occupied exclusively by Tenant; (ii) Wireless Equipment; and (iii) any Building penetrations caused by Wireless Equipment.

**(f)    Landlord Maintenance.**  Landlord will at its own expense maintain in reasonable condition all portions of the Property other than those that are the responsibility of Tenant as provided in Paragraph (e) above.

**(g)    Landlord Work in Demised Premises; Relocation.**  Landlord will use best efforts to provide at least thirty (30) days' notice (or as much notice as feasible in the event of an emergency) prior to performing any work in the Demised Premises (including but not limited to re-roofing and HVAC installations) that might interfere with Tenant's use or that may require the relocation of Wireless Equipment.  Tenant will cooperate with Landlord and, if required, will relocate any Wireless Equipment to an alternate location agreed on by the parties that provides substantially similar wireless coverage as the original location.  Upon the completion of the relocation, Tenant will move the Wireless Equipment back to the original locations unless Landlord, Tenant, and any applicable Licensees agree to utilize the relocation area permanently.  Landlord will bear the cost of any relocation and restoration of Wireless Equipment.  Landlord will use reasonable efforts to minimize any interruption of Tenant's or any Licensee's use of the Demised Premises.  In the event that Landlord cannot provide a feasible alternative

Rooftop Lease
Site _____

4

Authenticsign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

location and the work results in a disruption lasting longer than fifteen (15) days, Tenant at its option may require Landlord to bear the cost of a temporary installation such as a cell site on wheels or "COW."

**8. ACCESS.** The authorized personnel of Tenant and Licensees will have 24-hour, 7 days per week access to the Property to conduct any activities consistent with the Permitted Use or the allowed use under any License, including access to common areas and facilities of the Property including but not limited to parking spaces, restrooms, lobbies, elevators, escalators, and stairways. Tenant will notify Landlord by phone or electronic mail twenty-four (24) hours prior to access. In an emergency, Tenant will provide as much notice as reasonably feasible by phone or electronic mail. Tenant will not be required to pay any fee to access the Property. All access is subject to the reasonable regulations in effect at the Property, of which Landlord will inform Tenant in writing.

**9. INTERFERENCE.**

**(a)** **Tenant and Licensee Interference.** Tenant will ensure that the Wireless Equipment will not interfere with any systems or components at the Property existing as of the Commencement Date, provided however that said systems and components are functioning within normal operating parameters and are in compliance with Applicable Law. Tenant agrees to take all reasonable actions as soon as practicable, including but not limited to ceasing all operations (except for testing as approved by Landlord), until interference has been corrected to the reasonable satisfaction of the Landlord. All operations by Tenant and Licensees will comply with Federal Communications Commission ("*FCC*") regulations.

**(b)** **Landlord and Occupant Interference.** Subsequent to the Commencement Date, Landlord will not permit any Building user or occupant to install or modify any equipment or take any other action that causes interference with the operation of the Wireless Equipment or with the Permitted Use (including but not limited to electromagnetic interference as well as any physical obstructions of antennas). Unless required by Marriott or Franchisor Landlord agrees to take all reasonable actions as soon as practicable, including but not limited to ceasing all operations (except for testing as approved by Tenant) until interference has been corrected to the reasonable satisfaction of Tenant.

**(c)** **Emergencies.** If an emergency exists that Landlord reasonably attributes to Wireless Equipment, Landlord will immediately notify Tenant by phone and Tenant will diligently remedy the emergency. If an emergency poses an immediate threat to either life or human safety or is likely to result in significant property damage, and Tenant cannot remedy the emergency in time to prevent loss or damage, then Landlord may take any reasonable actions to avoid such consequence. Upon Tenant's response to the emergency, Landlord will restore whatever services it may have previously disrupted.

Rooftop Lease
Site _____

Case 1:24-cv-00340-AMN-DJS   Document 2   Filed 03/08/24   Page 14 of 27

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

## 10. ASSIGNMENT AND SUBLETTING.

(a)       **Tenant Assignment.**  Tenant may assign this Lease in whole or in part to (i) an Affiliate (as defined below) or (ii) to any lender or provider of financing to Tenant or to its Affiliate without the prior written consent of Landlord. If Tenant or any Affiliate is an entity whose equity interests are listed and traded on a nationally-recognized securities exchange or over-the-counter market, the transfer, sale, or other disposition (including issuance) of stock or other equity interests in such entity will not be deemed an assignment of this Lease. An "*Affiliate*" is any entity that: (i) directly or indirectly (through one or more subsidiaries) controls Tenant; (ii) is controlled directly or indirectly (through one or more subsidiaries) by Tenant; (iii) is under the common control directly or indirectly (through one or more subsidiaries) with Tenant by the same parent company; (iv) is the successor or surviving entity by a merger or consolidation of any such entity pursuant to Applicable Law; or (v) purchases substantially all of the assets of Tenant.

(b)       **Tenant Subletting.**  Tenant may enter into, modify, or terminate any License with the prior written consent of Landlord, which consent should not be unreasonably withheld.

(c)       **Landlord Assignment and Tenant Right of First Refusal.**  Landlord may convey any interest in the Property or assign this Agreement to any party other than a Competitor (as defined below) upon written notice to Tenant.  If Landlord receives an offer or desires to offer to convey any interest (including but not limited to options, leases, licenses, or easements) in interest in the Lease to a Competitor, Tenant will have the right of first refusal to purchase the interest being offered by Landlord on the same terms and conditions.  Landlord will notify Tenant of any Competitor's legitimate offer and will detail all of the material terms of the transaction.  Tenant will notify Landlord of its intention to meet the terms of the offer within sixty (60) days of receipt of Landlord's notice.  If Tenant fails to give notice, Landlord may pursue the offer with the Competitor on the stated terms and price, as long as (i) the conveyance is subject to the terms of this Lease and (ii) if the conveyance does not include the assignment of Landlord's full interest in this Lease, the purchaser agrees to perform any obligation of the Landlord that Landlord would not have the legal right or ability to perform following the conveyance.  Tenant's election not to exercise its right of first refusal will not be deemed to be a waiver of its right of exercise for future offers.  A "*Competitor*" is any person or entity directly or indirectly engaged in: the primary business of owning, acquiring, operating, managing, investing in or leasing infrastructure or real property interests involving the use of land or structures for Wireless Services or any purposes incidental thereto; or the business of providing Wireless Services for commercial purposes.

(d)       **Evidence of Ownership Change.**  In the event of any conveyance of Landlord's interest in the Property, this Lease shall run with the land and be binding upon and inure to the benefit of the parties' respective successors, personal representatives and permitted assigns, regardless of recordation. The transferor and the transferee will provide to Tenant within ten (10) business days of the transfer the following: (i) sufficient evidence of transfer including but not limited to an assignment and assumption agreement and deed; (ii) IRS Form W-9 of the transferee; and (iii) the notice and payment address of the transferee and emergency contact information.  Tenant will have the right to withhold Percentage Rent and/or other amounts owed until the information is provided, and will not be liable for the payment of any amount due hereunder that was made prior to the receipt of proper notice of change of Landlord's Payment Address and evidence of ownership change required by this paragraph.

## 11. TAXES AND ASSESSMENTS.

Tenant will pay or cause to be paid any taxes, assessments, charges, or fees identifiable and directly attributable to Wireless Equipment and the use of the Demised Premises by Tenant or Licensees levied under any Applicable Law, including any increase in real property taxes chargeable to Landlord resulting from the installation of Wireless Equipment.  Tenant will have no liability for any excess profit taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and

Rooftop Lease
Site _____

6

Case 1:24-cv-00340-AMN-DJS    Document 2    Filed 03/08/24    Page 15 of 27

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

succession taxes, estate taxes, federal and state income taxes, or other taxes applicable to Landlord's general or net income or chargeable to Landlord as a result of Landlord's business. Landlord is responsible for all other taxes related to the Property.

## 12. INSURANCE AND INDEMNITY.

(a)         **Licensee's Insurance.** Tenant will require all Licensee's, Sublicensee's and/or Wireless Providers to procure and continue in force during the Term at its own expense: (i) workers' compensation insurance (at statutory limits) and employer's liability insurance with minimum limits of $500,000; (ii) commercial general liability and property damage insurance providing occurrence form coverage for operations and for contractual liability with respect to liability assumed by that sublicensee or Wireless Provider hereunder, such insurance including a designated location general aggregate limited endorsement equivalent to ISO form CG 25 04, and with limits of coverage for such insurance not being less than $1,000,000, with a combined limit for bodily injury and/or property damage for any one occurrence and $2,000,000 in the aggregate; (iii) excess liability (umbrella) insurance with a minimum limit of $5,000,000 per occurrence; and (iv) special form endorsement for causes of loss with replacement value coverage insuring the Demised Premises and its appurtenant personal property for its full replacement cost. All policies will be written by an insurer acceptable to Landlord licensed to do business within the state where the Property is located and will provide that such coverage will not be cancelled or materially, adversely changed without a minimum of thirty (30) days' written notice to Landlord. The policies listed in Clauses (ii) and (iii) above will list Landlord, Tenant and its property Landlord as additional insureds, by endorsement or otherwise. Wireless provider or Sublicensee may procure the coverage required under this paragraph under one or more blanket policies of insurance covering the Demised Premises and other locations of Sublicensee or Wireless Provider. Upon request of Landlord, Tenant will obtain from Sublicensee or Wireless Provider a certificate of insurance evidencing this coverage.

(b)         **Landlord's Insurance.** Landlord will procure and continue in force during the Term at its own expense a commercial general liability and property damage insurance policy on an occurrence basis in an amount not less than $1,000,000 combined single limit. Upon request of Tenant, Landlord will provide a certificate of insurance evidencing this coverage.

(c)         **Contractor and Licensee Insurance.** Tenant will require that all Licensees and contractors produce a certificate of insurance evidencing the existence of the insurance described in Clauses (i) and (ii) of Paragraph (a) above as well as builder's risk insurance with a limit not less than 100% of the estimated value of the improvements being constructed by any contractor prior to performing any work. All policies under this paragraph other than the worker's compensation policy will name Landlord, Tenant and Landlord's property manager as additional insureds and will contain a thirty (30) day written notice of cancellation to Landlord. The insurance may be carried under one or more blanket policies covering the Demised Premises and other locations of the Licensee or contractor. A Licensee may self-insure provided that it: (i) uses an independent third party administrator to manage all claims; (ii) maintains sufficient capital reserves; and (iii) complies with Applicable Law including the timely making all necessary government filings. The self-insured coverage will be similar to the coverage contained in Insurance Services Office policy form CG 00 01, or its equivalent.

(d)         **Release; Waiver of Subrogation.** Each party releases the other party and their respective shareholders, directors, members, managers, partners, officers, employees, and agents ("*Associates*") from any claims arising in its favor against the other party relating to personal injury or property damage at the Property from any cause unless the injury or damage is the result of (i) the willful misconduct of the other party or its Associates or (ii) the negligence of the other party or its Associates, provided that said party and its Associates will be released to the extent that the injury or damage is recovered or

Rooftop Lease
Site _____

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

recoverable under an insurance policy of the party suffering the injury or damage. All policies of insurance maintained by a waiving party or required to be maintained under this Lease will contain or be endorsed to contain a provision whereby the insurer waives all rights of subrogation against either Tenant or Landlord and their Associates, as the case may be. If either party is unable to obtain an insurance policy with a waiver of subrogation, then subrogation will not be waived by either party. If the waiver of subrogation contravenes any Applicable Law, the liability of the party affected will be secondary to the other's insurer but will not be released.

(e)     **Indemnification.** Subject to Paragraph (d) above, each party ("*Indemnitor*") will defend, indemnify, and save harmless the other party ("*Indemnitee*") and its Associates against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees actually incurred, that may be imposed upon or incurred by or asserted against the Indemnitee or its Associates by a third party by reason of any of the following events occurring during the Term: (i) any Default by the Indemnitor (as defined in Section 13(a)) or (ii) any negligence or willful misconduct of the Indemnitor or its Associates. To be indemnified, the Indemnitee must: give the Indemnitor timely written notice of the claim (unless the Indemnitor already has notice); give the Indemnitor full and complete authority, information, and assistance for the claim's defense and settlement; and not, by any act, admission, or acknowledgement, materially prejudice the Indemnitor's ability to satisfactorily defend or settle the claim. The Indemnitor will retain the right, at its option, to settle or defend the claim at its own expense and with its own counsel. The Indemnitee will have the right, at its option, to participate in the settlement or defense of the claim with its own counsel and at its own expense, but the Indemnitor will retain sole control of the claim's settlement or defense.

## 13. REMOVAL OF EQUIPMENT UPON TERMINATION OR EXPIRATION. Following the termination or expiration of this Lease, Tenant will remove any Wireless Equipment owned by Tenant from the Property, and following any termination or expiration of any License during the Term, Tenant will cause the applicable Licensee to remove any Wireless Equipment owned by said Licensee from the Property. In performing the removal, Tenant will restore the Demised Premises to as good a condition as it was in prior to the installation of Wireless Equipment, reasonable wear and tear and casualty excepted, unless Landlord and Tenant otherwise agree in writing.

## 14. DEFAULT AND TERMINATION.

(a)     **Default.** It will be a "*Default*" if: (i) any party's representations or warranties are false in any material respect; (ii) either party fails to pay when due any sum of money due to the other party, and the non-complying party does not remedy the failure within fifteen (15) business days after written notice by the other party; or (iii) either party fails to perform any other obligation and does not remedy the failure within thirty (30) days after written notice by the other party or, if the failure cannot reasonably be remedied in such time, if the non-complying party does not commence a remedy within thirty (30) days and exercise reasonable efforts to prosecute the remedy to completion.

(b)     **Remedies.** Upon the occurrence of a Default, the non-defaulting party will be entitled to terminate this Lease upon thirty (30) days' written notice to the defaulting party. The non-defaulting party will have the obligation to mitigate its damages arising out of or resulting from such Default and subsequent events.

(c)     **Waiver of Consequential Damages.** NEITHER PARTY WILL BE LIABLE TO THE OTHER NOR TO ANY THIRD PARTY FOR LOSS OF ANTICIPATORY PROFITS OR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, LOST BUSINESS OPPORTUNITIES, IMPERFECT COMMUNICATIONS, MARKET SHARE OR CONSEQUENTIAL DAMAGES ("*CONSEQUENTIAL DAMAGES*") INCURRED IN CONNECTION WITH THIS LEASE INCLUDING BUT NOT LIMITED TO ANY CONSEQUENTIAL DAMAGES ARISING FROM OR

Rooftop Lease
Site _____

Authensign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

RELATED TO ANY NETWORK DISRUPTION, MALFUNCTION, DISRUPTION OF SERVICE, VANDALISM, ACTS OF GOD (INCLUDING, WITHOUT LIMITATION, LIGHTNING, WIND, RAIN, HAIL, FIRE OR STORMS), OR ANY OTHER REASON, EVEN IF THE PARTIES CONTEMPLATED THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

**(d)** **Additional Termination by Tenant.** Provided that no Default exists by Tenant, Tenant will have the right but not the obligation to terminate this Lease without further liability to Landlord as provided below: (i) upon thirty (30) days' written notice if Tenant or greater than two-thirds (2/3) of the Licensees are unable to operate Wireless Equipment in accordance with the Permitted Use as a result of material interference (other than on a temporary, non-recurring basis); (ii) upon thirty (30) days' written notice if Tenant or greater than two-thirds (2/3) of the Licensees are unable to obtain or maintain any rights necessary to provide access or utilities to the Demised Premises; (iii) upon thirty (30) days' written notice if Tenant or greater than two-thirds (2/3) of the Licensees are unable to obtain, maintain or reinstate within thirty (30) days any Required Approvals despite the diligent efforts of said parties to obtain and maintain such approvals; (iv) upon thirty (30) days' written notice if the Licenses of greater than two-thirds (2/3) of the Licensees at the Building terminate or expire; (v) upon thirty (30) days' written notice if a utility service interruption persists for more than thirty (30) consecutive days; (vi) as provided in Section 16 in the event of casualty or condemnation; and (vii) upon one hundred eighty (180) days' written notice. Upon Tenant terminating in accordance with this paragraph, Tenant will surrender and vacate the Demised Premises and deliver possession to Landlord on or before the termination date stated in such termination notice. All Percentage Rent payable under this Lease will be paid through and apportioned as of the date of termination. Neither party will have any rights or obligations under this Lease with respect to the Demised Premises surrendered by the Tenant for the period accruing after the effective date of termination of the Lease except as specifically provided in this Lease. To the extent any of the foregoing reasons for termination are caused by a Default by Landlord, Tenant may pursue any remedies as described in Paragraph (b) above.

## 15. POST-TERMINATION AND EXPIRATION PROCEDURES.

**(a)** **Transition to Landlord.** Upon the expiration or termination of this Lease, Tenant will take all reasonable actions to transition the Demised Premises to Landlord and will deliver the following to Landlord within thirty (30) days: (i) a final accounting for the outstanding License Fees for which Tenant is responsible for collecting as of the date of termination or expiration; (ii) a list of all persons or entities with whom Tenant was negotiating a License within twelve (12) months prior to the expiration or termination of the Lease but who had not yet executed a License ("*Negotiation List*"); and (iii) copies of all Licenses, books, records, contracts, drawings, keys, receipts for deposits, unpaid bills, and all other papers or documents that pertain thereto.

**(b)** **Attornment and Non-Disturbance of Licenses.** If this Lease expires prior to the termination of a License, each Licensee will attorn to Landlord, (in such circumstance, "*Substitute Lessor*") and recognize Substitute Lessor as lessor under its License, and Substitute Lessor will not disturb the interest of a Licensee provided that it is not in default of its License. Tenant will cause each Licensee to execute and deliver at any time upon request of Substitute Lessor any instruments that may be necessary to evidence such attornment. Tenant agrees that upon the expiration of this Lease, Tenant will immediately pay or transfer to Substitute Lessor any security deposit or other sums then held by Tenant with respect to any License for which Substitute Lessor succeeds to Tenant's interest.

**(c) Residual Payments to Tenant.** If this Lease (i) expires or is terminated by Landlord for any reason other than Default by Tenant, or (ii) is terminated by Tenant due to a Default by Landlord, then an "*Early Termination*" will have occurred. If Licenses are still in effect as of the effective date of an Early Termination, then for remainder of the then current term and any renewals thereof, Tenant will

Rooftop Lease
Site _____

Case 1:24-cv-00340-AMN-DJS  Document 2  Filed 03/08/24  Page 18 of 27

Authenlisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

receive on the fifteenth (15th) day of each month the Residual Payments for each prior month, the rate of residual revenue due Tenant shall equal the rate due Tenant pre-termination or expiration of this Agreement.

(d) If within one (1) year after the expiration or termination of this Lease, Landlord enters into any license, sublicense, lease, or sublease with any party or an affiliate identified on the Negotiation List for use of the Demised Premises for the provision of Wireless Services from the Property, over the Property, or to areas surrounding the Property, then such license, sublicense, lease, or sublease will be deemed to have been a License with a commencement date as of the day immediately prior to the day of the expiration or termination of this Lease, and Tenant will be entitled to Residual Payments for the first five (5) years of said agreement. In addition, Tenant will continue to receive to the extent Landlord collects same the fees and sums to which Tenant would have been entitled allocable to the periods of time prior to the expiration or termination of the Lease, including but not limited to back rent payments, reimbursements, and similar payments. Landlord will maintain sufficient records for Tenant to properly account for the License Fees at the Building and other sums collected by Landlord, which will be open to inspection and audit by Tenant upon Tenant's request. Any underpayment or delinquent payment by Landlord will bear interest from the date such payment was otherwise due at a rate of three percent (3%) above the U.S. Prime Rate as published in the *Wall Street Journal* or if the U.S. Prime Rate is not available, then such comparable substitute rate as may be reasonably selected by the parties. The provisions of this paragraph will survive the expiration or termination of this Lease.

## 16. UTILITIES.

(a) **Utilities Required.** The parties acknowledge that utilities including but not limited to electricity, telephone service, and internet access are essential to the operation of Wireless Equipment and that Tenant and Licensees have the right to obtain utility service at market rates without the payment of additional consideration to Landlord by Tenant, any Licensee, or any utility provider. Tenant and Licensees will have the right to choose the utility provider that will service the Wireless Equipment.

(b) **Electricity Consumption and Metering.** Tenant will pay for all electricity used by Wireless Equipment or cause Licensee's to pay for all electricity used by the same. Tenant or Licensee will contract directly with the local electric utility to install separate metering devices to measure the usage of Licensees, in which case Tenant will cause the Licensee to pay the utility directly for such usage. If the local utility does not allow direct service or if the cost of installing direct service exceeds $2,000.00 per installation, then Tenant may submeter its usage and/or the usage of Licensees from Landlord's electrical system pursuant to Paragraphs (b) and (c) below.

(c) **Landlord Billing.** If Tenant is not billed directly by the electric utility, Tenant will pay for Tenant's electricity consumption based on the average kilowatt-hour rate actually paid by Landlord to the utility for electricity at the Building without mark-up by or profit to Landlord (but taking into account all direct costs and expenses actually incurred by Landlord to provide such utility). Landlord and Tenant will estimate the monthly cost of electrical service consumed by Licensees from time to time (but not more than one time in any twelve (12) month period) based upon prior usage and rates, and Tenant will require Licensee's to pay such agreed upon estimated monthly cost of electrical service to Landlord along with Percentage Rent. Within sixty (60) days of the end of each Lease Year, Landlord may provide a statement of the actual electricity usage of any Licensees along with supporting evidence. In the event of an underpayment by Licensees, Landlord will provide an invoice with the statement and Tenant will cause Licensees to pay the amount due within thirty (30) days of receipt. In the event of any overpayment by Licensees, Tenant may request a refund from Landlord, which will be paid within thirty (30) days, or it may request Landlord to credit the amount to future payments of Percentage Rent or utilities.

Rooftop Lease
Site _____

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

**(d)**      **Electrical Service Outages and Interruptions.** Landlord will reasonably schedule any planned utility outage outside of the Property's normal business hours and will notify Tenant at least two (2) business days in advance of any planned utility outages of which Landlord has notice that may interfere with the use and operation of Wireless Equipment. Landlord will reasonably cooperate with Tenant in obtaining alternate power for Licensees during planned utility outages and Landlord will use reasonable diligence to restore any interruption in electrical service as soon as possible to the extent Landlord has the ability to do so.

**(e)**      **Lighting and HVAC for Interior Areas.** To the extent the Demised Premises includes any interior areas of the Building, Landlord will supply to those areas at no cost to Tenant lighting and HVAC in normal quantities consistent with that supplied to the remainder of the Building. In the event of any interruption to lighting or HVAC, Landlord will restore said services as soon as reasonably feasible.

## 17. CASUALTY AND CONDEMNATION.

**(a)**      **Casualty.** In case of damage to any part of the Property that is essential to the Permitted Use, Landlord will at its own expense repair the Property to a condition as nearly as practicable to that existing prior to the damage unless Landlord reasonably decides not to repair or rebuild the Property because of the following: (i) the casualty is not insured under standard fire policies with extended type coverage; (ii) the holder of any mortgage, deed of trust, or similar security interest encumbering the Building does not permit the application of adequate insurance proceeds for repair or rebuilding; or (iii) the damage affects a significant portion of the Building. Within thirty (30) days from the date of casualty, Landlord will provide written notice to Tenant of its intent to either repair the damage, which will include an estimated date of completion. If Landlord's estimate to repair the damage exceeds one hundred eighty (180) days from the date of casualty or it not actually completed within said time period, Tenant will have the option to terminate this Lease upon written notice to Landlord. In the event that either party terminates the Lease pursuant to this section, the termination will be effective as of the date of casualty and Percentage Rent will be abated as of the date of casualty and reimbursed to Tenant.

**(b)**      **Condemnation.** If all or "substantially all" (meaning the remaining portion is not of sufficient size or condition to permit the continuation of any of the Permitted Use in a reasonable manner) of the Property is taken by eminent domain, or by deed in lieu of condemnation, then Tenant may terminate this Lease by providing written notice to Landlord within thirty (30) days of such condemnation or eminent domain action, which will be effective as of the date of the vesting of title in such taking and any amounts prepaid to Landlord will be apportioned as of said date and reimbursed to Tenant, and Landlord and Tenant may pursue their own separate awards. In the event of any taking of less than all or substantially all of the Demised Premises, this Lease will continue and Landlord and Tenant may pursue their own separate awards.

**18. QUIET ENJOYMENT AND TITLE.** Landlord represents that: (i) Landlord has good, marketable fee simple title to or a long-term lease for the Property free and clear of any restrictions, conditions, covenants, easements, leases or licenses that will interfere with, impair or adversely affect the right of Tenant and Licensees to conduct the Permitted Use at the Property; (ii) Landlord's execution and performance of this Lease will not violate any Applicable Laws, covenants, or the provisions of any mortgage, deed of trust, encumbrance or lease binding on Landlord; (iii) Landlord is not in default of any underlying leases from which the Landlord derives its interest in the Property or any mortgage or deed of trust that encumbers the Property, or has committed no act that with the mere passage of time or if the giving of notice will ripen into a default; (iv) Landlord has provided to Tenant all copies of any agreement for the provision of Wireless Services at the Property; and (v) Tenant will have the quiet enjoyment of the Demised Premises as long as there is no Default by Tenant.

Rooftop Lease
Site _____

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

**19. SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT.** This Lease is subject and subordinate to all existing leases for the Property (provided that the same have been provided to Tenant) and to all mortgages, deeds of trust and similar security documents that may now exist encumbering the Property, and to all renewals, modifications, consolidations, replacements and extensions. Landlord will ensure non-disturbance and attornment of this agreement from any lender, lessee, purchaser, or other holder of an interest in the Property (collectively "*Interest Holder*"). Landlord will ensure any Interest Holder will not disturb Tenant's interest in the Lease following any foreclosure, deed-in-lieu of foreclosure, or other event as long as the Lease is in force and effect and there is no Default by Tenant; that the Tenant agrees to attorn to and recognize the Interest Holder as landlord under the Lease; and to the extent that the Lease has a higher priority than the interest of the Interest Holder, that the Lease will be subordinate in priority to the interest of the Interest Holder.

**20. WAIVER OF LIENS.** Landlord waives any statutory liens with respect to any Wireless Equipment used as collateral for any loans or lines of credit of Tenant, any Affiliate, or Licensees. Tenant or Licensees may pledge or collaterally assign their ownership rights in Wireless Equipment to any financing source. The collateral assignment or pledge will not affect the Property or any Building and the Tenant or Licensees may not create a lien or encumbrance on the real estate to which the Wireless Equipment is affixed. So long as any lender has cured any failure of Tenant to perform its obligations under the Lease within the cure or grace periods set forth in this Lease, Landlord agrees not to dispossess Tenant or terminate this Lease as a result of such failure and agrees to accept performance of the lender in curing such failure as that of the Tenant. In that regard, Landlord hereby agrees to give notice of any failure or any Default by Tenant to any lender of which Landlord has knowledge.

**21. NOTICE.** Except as otherwise stated, all notices must be in writing and personally delivered, mailed via U.S. certified mail return receipt requested, or transmitted by courier for next business day delivery to the Notice Addresses of Landlord and Tenant in Section 1. Either party may change its Notice Address by sending written notice to the other party, and the new Notice Address will be effective fifteen (15) days after receipt by the other party. Notices changing a party's Payment Address will be effective thirty (30) days after receipt by the other party. Notices will be deemed to have been given upon either receipt or rejection. Any notice that is given by a party may be given by the attorneys for that party. Only notices threatening to declare or declaring a party in default or terminating this Lease will be required to be sent to that party's attorney.

**22. MARKING AND LIGHTING REQUIREMENTS.** Tenant will install Wireless Equipment in compliance with all marking and lighting requirements of the Federal Aviation Administration ("*FAA*") and the FCC. If Tenant is cited by the FCC or FAA because the Building is not in compliance with such regulations, and such non-compliance is not due to any Wireless Equipment, Landlord will cure the conditions of noncompliance within sixty (60) days after receipt of notice and will reimburse Tenant for any expenses incurred as a result of said citation. If lighting requirements are imposed by the FAA and/or the FCC and a lighting automatic alarm system has been installed by Landlord, Landlord will allow Tenant to bridge-in to the system to permit a parallel alarm or to install a second alarm (in either case, to the extent permitted under any other lease of the Building or a portion thereof that is affected by such actions) if a parallel alarm would interfere with Landlord's alarm. Licensees will be responsible for the cost and expense of maintaining the second or parallel alarm.

**23. HAZARDOUS SUBSTANCES.**

(a)        **Definition of Hazardous Substances.** "*Hazardous Substances*" are any toxic or hazardous substance, material or waste or any pollutant or infectious or radioactive material, including, but not limited to, those substances, materials or waste now or in the future regulated under Applicable Law pertaining to hazardous substances, materials, wastes, chemical substances or mixtures, toxic substances,

Rooftop Lease
Site _____

Authenlisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

air pollutants, toxic pollutants, solid waste or other similar substances or for the protection of health, ecology, or environment.

**(b)        Use of Hazardous Substances.**  Tenant agrees that it will operate and maintain the Demised Premises in compliance with all Applicable Law, and will not use, generate, store or dispose of Hazardous Substances on, under, about or within the Property; except for those materials that are necessary and directly related to the Permitted Use, in which case, the use, storage and disposal of such Hazardous Substances will be in compliance with Applicable Law.  Notwithstanding anything contained in this Lease to the contrary, Tenant will not have any liability to Landlord resulting from any conditions existing, or events occurring, or any Hazardous Substances existing or generated at, in, on, under or in connection with the Demised Premises prior to the Commencement Date, except to the extent Tenant has been notified of the existence thereof by Landlord and exacerbates the same through its negligence or willful misconduct and then only to the extent of such exacerbation.

**(c)        Notice to Tenant of Hazardous Substances.**  Landlord will provide any and all information regarding the presence or absence of Hazardous Substances identified in areas where Tenant operates or requires access to install or maintain Equipment.  Landlord acknowledges that in the absence of confirming data or reports, Tenant may conduct further testing to ensure compliance with regulatory requirements.  Specifically excepted are de minimus amounts of Hazardous Substances being used by Landlord and tenants and occupants of the Property in connection with such parties' ordinary and regular conduct of business at the Property in accordance with Applicable Law.

**24. ESTOPPEL CERTIFICATES.**  Within thirty (30) days after either party's request, the other party will deliver a statement stating: (i) that this Lease is in full force and effect and whether any options granted to Tenant have been exercised; (ii) the amount of rent paid and the payment dates, and any overpayment, underpayment, or prepayment (iii) to the actual knowledge of the certifying party, whether or not there is a Default by either party; (iv) whether Tenant has any rights to offsets or abatement of rent; and (v) certifying such other facts as the requesting party reasonably requests.

**25. MEMORANDUM OF LEASE.**  Neither party may record this Lease.  Upon the request of either party, the other party will execute a memorandum of this Lease in a form acceptable to the parties within thirty (30) days of receipt of the request.  The requesting party may record the document at its own cost.

**26. AUTHORITY.**  Each party warrants that (i) it legally exists and is in good standing in its state of domicile and the state in which the Property is located, (ii) it is qualified to do business in the state in which the Property is located, and (iii) it has authority to enter into this Lease and has obtained all necessary consents to perform its obligations.  Each person executing this Lease on behalf of such party warrants that he/she is authorized to do so.  Upon either party's request, the other party will provide evidence reasonably satisfactory to the requesting party confirming the foregoing warranties.

**27. EQUIPMENT AS PERSONALTY.**  The Wireless Equipment remains the personal property of the Tenant or any Licensee, as appropriate, even though it may be attached to the Property, and is removable consistent with the provisions of this Lease.

**28. BROKERS.**  Each party is responsible for any obligations or liability, contingent or otherwise, for broker's or finder's fees or other like payment arising out of that party's dealings with third parties.

**29. PRE-EXISTING LICENSES.**  As of the Commencement Date, Landlord hereby assigns to Tenant and Tenant hereby assumes all of the Pre-Existing Licenses listed on Exhibit B hereto, if any.  Landlord warrants that: (i) Landlord has delivered complete copies to Tenant of all written Pre-Existing Licenses and abstracts or digests of all oral Pre-Existing Licenses in effect and (ii) as of the Commencement Date, all Pre-Existing Licenses listed on Exhibit B are in effect and not in default, or to the Landlord's best

Rooftop Lease<br>Site _____

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

knowledge, after due inquiry, there has occurred no event that with the passage of time or the giving of notice, will ripen into a default. Landlord and Tenant will execute any additional agreements as required by either party in order to effect said assignment and assumption.

## 30. MISCELLANEOUS.

**(a)      Business Days.** If the day for performance falls on a Saturday, Sunday or holiday for which banking institutions in the state in which the Property is located are generally closed, then the day for such performance will be the next business day.

**(b)      Force Majeure.** The period of time during which either party is prevented or delayed in the performance of any non-monetary obligation required to be performed under this Lease due to delays caused by fire, catastrophe, strikes, labor trouble, civil commotion, acts of God or the public enemy, governmental prohibitions or regulations or other causes beyond such party's reasonable control, will be added to such party's time for performance thereof, and such party will not be deemed in default hereunder as a result of such delay.

**(c)      Entire Agreement; Amendment.** This Lease embodies the entire agreement between the parties and it may not be amended, modified or terminated except by a writing duly signed by the party to be charged. There are no representations or understandings existing prior to the date hereof between Landlord and Tenant that are not stated in this Lease.

**(d)      Severability.** If any of the provisions of this Lease, or the application thereof to any person or circumstances, is held invalid or unenforceable, the remainder of this Lease, or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, will not be affected thereby, and every provision of this Lease will be valid and enforceable to the fullest extent permitted by Applicable Law.

**(e)      Non-Waiver.** A party's failure to exercise its rights with respect to a breach of any term of this Lease or to insist on the strict performance of any term of this Lease will not be a waiver of such term.

**(f)      Relationship of Parties.** Landlord and Tenant acknowledge and agree that the relationship between them is solely that of Landlord and tenant, and nothing will be construed to constitute the parties as employer and employee, partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking. Neither party, nor its employees or agents will have any right, power or authority to act or create any obligation, express or implied, on behalf of the other.

**(g)      Interpretation.** The pronouns of any gender will include the other gender, and either the singular or the plural will include the other. References in this Lease to sections, paragraphs or clauses will refer to those sections, paragraphs or clauses set forth in this Lease unless the context expressly requires otherwise. Headings of sections or paragraphs are for convenience only and will not be considered in construing the meaning of the contents of thereof.

**(h)      Consent.** Whenever the consent of a party is required by this Lease, consent may not be unreasonably withheld, delayed, or conditioned unless it is specifically stated that consent is in the party's sole discretion. It will not be reasonable for any party to request additional payments, fees, or other consideration from the other party in exchange for consent.

**(i)      Attorneys Fees.** Should either party institute any legal proceedings against the other for breach or failure to perform any provision contained in this Lease and prevail in such action, the non-

Rooftop Lease
Site _____

14

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

prevailing party will in addition be liable for the cost and expenses of the prevailing party, including its reasonable attorneys' fees at trial and through appeal.

**(j)      Survival.**   Any provisions of this Lease that in order to have effect must survive the expiration or termination of this Lease will be deemed to survive.

**(k)      Copies.**   This Lease may be executed in multiple counterparts, each of which will, for all purposes, be deemed an original, but which together will constitute one and the same instrument.   The parties agree that a scanned or electronically reproduced copy or image of this Lease will be deemed an original and may be introduced or submitted in any action or proceeding as competent evidence of the execution, terms and existence hereof notwithstanding the failure or inability to produce or tender an original, executed counterpart of this Lease and without the requirement that the unavailability of such original, executed counterpart of this Lease first be proven.

**[SIGNATURES ON FOLLOWING PAGE]**

Rooftop Lease
Site _____

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease as of the Commencement Date.

**TENANT:**

**PARAGON WIRELESS GROUP LLC,**
*a Florida limited liability Company*

By:   *Jessica Melton*

Name
:    Jessica Melton

Title:    President

Date:    01/30/23

**LANDLORD:**

**COLUMBIA SUSSEX CORPORATION,**
*a Kentucky corporation*

By:   *Scott Yung*

Name
:    Scott Yung

Title:    VP Operations

Date:    01/31/23

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

**EXHIBIT "A" TO ROOFTOP LEASE**
**DESCRIPTION OF PROPERTY**

Albany Marriott Hotel

189 Wolf Rd, Albany, NY 12205 in Albany County, New York

Authentisign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

**EXHIBIT "B" ROOFTOP LEASE**
**PRE-EXISTING LICENSES**

AT&T (New Cingular Wireless)

Authensign ID: 16B1EAE1-0DA1-ED11-BF7A-0050F28F322C

## EXHIBIT C TO ROOFTOP MARKETING AND MANAGEMENT AGREEMENT
## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSUMPTION AGREEMENT** ("Agreement") is effective as of _____ by and between _____ a _____ ("Owner") and _____ a _____ ("Paragon").

**WHEREAS,** Owner is the present owner and/or holder of one or more buildings that constituted the original owner's interest in a Marketing and Management Agreement dated _____ between _____ and _____ (the "Contract"). The Contract, together with any Amendments thereto, is attached hereto as **Exhibit A**;

**WHEREAS,** Owner has assumed the prior owner's interest in Paragon Site # _____, located at _____ and desires that Paragon will provide or continue to provide to Owner any services and/or rent payments required by the Contract; and

**WHEREAS,** Paragon desires to provide or continue to provide to Owner any services and/or rent payments required by the Contract.

**NOW THEREFORE,** in consideration of the payment of ten and 00/100 dollars ($10.00), and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Owner hereby agrees to be bound by all of the rights, obligations and covenants of the Contract, and assumes all of the rights, duties and obligations as Owner under the Contract.

2.      This Agreement (i) shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns; (ii) may be executed, scanned and delivered to Paragon by email scan or PDF and/or in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, but all of which shall together constitute one and the same instrument; and (iii) shall become binding when one or more of the counterparts hereof, individually or taken together, shall have been executed and delivered by all of the parties hereto.

4. As of the date above, notices to Paragon under the Contract shall be delivered to:
Paragon Wireless Group, LLC                       cc:     jmelton@paragonwirelessgroup.com
336 NE 28th Terrace
Boca Raton, FL 33431
Attn: Legal

**IN WITNESS WHEREOF,** the Owner has executed this Agreement effective as of the day and year first above written.

_____
Authorized Signature) _____
By: (Name & Title)_____

Title: _____